STATE OF CONNECTICUT *v.* SOLOMAN MAYE
(AC 21814)

Dranginis, Bishop and Healey, Js.

Argued March 21—officially released July 9, 2002

*E. Gregory Cerritelli,* with whom, on the brief, were *Glenn M. Conway* and *Tara L. Knight,* for the appellant (defendant).

*Julia K. Mahoney,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Kim McCabe,* assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Soloman Maye, appeals from the judgment of the trial court revoking his probation and imposing a four year sentence. On appeal, the defendant claims that the court (1) deprived him of his federal and state constitutional rights to cross-examine and confront witnesses in denying his request to conduct an in camera inspection of a witness' psychiatric records and (2) improperly found that he violated a condition of his probation on the basis of allegations that were not contained in the violation of probation warrant in derogation of his due process rights. We affirm the judgment of the trial court.

The following facts are relevant to our resolution of this appeal. On January 28, 1998, the trial court sentenced the defendant to seven years incarceration, execution suspended, with four years of probation, following the defendant's guilty plea to the crime of possession of a narcotic substance in violation of General Statutes § 21-279 (a). As conditions of his probation, the defendant agreed, in pertinent part, not to violate any criminal laws, to report to his probation officer as directed, to permit his probation officer to visit him when needed and to keep the probation officer informed of his whereabouts.

Over two years later, during the afternoon of May 30, 2000, a woman, while driving a vehicle and looking visibly upset, motioned for Officer Karen Roberts of the New Haven police department, who was driving behind her in a marked police vehicle, to pull over to the side of the road. The woman, who identified herself as Passion Harris, told Roberts that the defendant, her boyfriend and the father of her two children, had hit her a few moments earlier. Roberts noticed that Harris' neck was discolored and that her shirt was torn. Harris elaborated that she was sitting in her car about to pull

out of a driveway when the defendant grabbed the steering wheel. As she drove away, Harris claimed that the defendant continued to hold onto the steering wheel, punched her and ripped her shirt. Harris then lost control of the car and drove into a parked car.

Roberts went to 233 Howard Street in New Haven, where the incident occurred, and observed the damaged parked car. She also observed the damage to Harris' vehicle. Harris later explained to another police officer, Joe Dease, that the defendant attempted to choke her. Dease also observed red marks on Harris' neck. Two other New Haven police officers, including Dease, found the defendant that afternoon. The defendant was arrested and charged with reckless endangerment in the first degree and assault in the third degree.

The defendant's probation officer, Brenda Westberry, subsequently prepared a violation of probation warrant. In the warrant, Westberry alleged that she had notified the defendant to report to her office on May 2, 2000, and on May 30, 2000, and that the defendant had failed to appear on both occasions. The warrant further described the incident with Harris and stated that the defendant "is considered to be in violation of his probation based on his noncompliance with the following: 'Do not violate any law.'"

A probation revocation hearing ensued. The trial court found that the defendant had violated his probation by failing to report to his probation officer on May 2 and May 30, 2000, and by violating the law with respect to the altercation with Harris. The trial court committed the defendant to the custody of the commissioner of correction for a period of four years. Additional facts will be set forth where necessary to the issues raised.

I

The defendant first claims that the court deprived him of his constitutional right to confront and cross-

examine witnesses when it denied his request to conduct an in camera inspection of Harris' psychiatric records.[1] We are not persuaded.

The following additional facts are relevant to our resolution of this issue. Prior to the hearing, defense counsel obtained a letter written by Harris to the defendant detailing that she suffered from mental illness. Defense counsel also came into possession of a letter from Catholic Family Services stating that Harris receives treatment for depression. During the hearing, but before the state called Harris as a witness, defense counsel sought a continuance of the trial until he could obtain Harris' psychiatric records and further requested that the trial court conduct an in camera inspection of those psychiatric records. The trial court denied the defendant's motion at that time.

During direct examination, Harris acknowledged that she took medication for her mental illness. Harris further testified that the medications helped to "clarify things and [make] things calmer," but that they did not interfere with her ability to testify truthfully. Harris also stated that she would not consent to an inspection of her mental health records.

The defendant introduced into evidence during cross-examination a letter written by Harris to him and also a document prepared by a therapist at Catholic Family Services. In the letter, Harris wrote that she attended counseling and that she might be "crazy." The document prepared by a social worker at Catholic Family Services provided that Harris sought treatment for and suffered from "major depressive disorder," and that bipolar disorder was "rule[d] out." The defendant proceeded to

---

[1] The defendant asserts his rights under the sixth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. Because the defendant did not separately address his state constitutional claim, we resolve this issue only on federal constitutional grounds.

question Harris about her mental illness and the treatment she had sought. Harris admitted that she had anger management problems and that she had not taken her medication on May 30, the date of the incident with the defendant. Harris further testified that when she did not take her medication, she sometimes became angry and might yell, scream and lie. Moreover, Harris stated that a physician at the Hospital of Saint Raphael had told her that she might have schizophrenia, but that he never followed through with any tests or definite diagnosis.

At the conclusion of his cross-examination of Harris, the defendant renewed his motion for the trial court to conduct an in camera inspection of Harris' mental health psychiatric records on the ground that they might contain information related to Harris' ability to tell the truth and to perceive the events of May 30, 2000, accurately. Particularly, the defendant argued that the in camera review could reveal the effect of the medication on Harris' ability to tell the truth. In response, the state contended that Harris had been completely forthcoming with defense counsel, had answered all of his questions and that "[t]his is a specific attempt to circumvent her testimony and have it stricken, because when those records come in, Your Honor, she is not going to agree to your doing an in camera inspection . . . ." The trial court then ordered briefs on the issue.

After reviewing the parties' briefs, the court denied the defendant's request for an in camera inspection of Harris' mental health records. In denying the request, the court stated that it found Harris' "testimony to be lucid; I found her testimony to have—to consist of very few inconsistencies with . . . the observations made by the initial police officer; her observations of the victim at the time; her observations of the damage to the victim's car, as well as to the other car at the alleged scene of this event; her observations as to the red marks

around the neck, which were not testified to by the victim, but the victim did explain how those red marks most likely took place . . . . I am also aware of Ms. Harris' potential conflict in this matter. I'm aware that she has a child by the defendant, if not two children. . . . Based on her testimony, it's obvious that there has been a long-standing relationship . . . . She indicated on the record that she has gone to a number of hospitals . . . that she has had a number of . . . theoretical diagnoses . . . that she was supposed to take medication, that during this time she did not take medication, and that when she doesn't take medication she's prone to anger and that, on occasion, she lies.

"I find, however, that her testimony being corroborated, as it is, not only by officers at the scene but by the admissions that the defendant himself gave to the police officers. I am impressed most of all by the amount of corroboration independent of her testimony that exists . . . . There is no indication, in my mind, that her ability to recollect the facts of this occasion accurately has been affected in any way by any theoretical medical illness." The trial court further noted that the letter from Catholic Family Services, which the defendant entered into evidence, revealed that Harris has "issues with depression, mood swings, anxiety and anger. . . . That, to me, does not translate into someone who cannot accurately depict the events of this occasion. In short, I feel the defense has failed to meet the threshold. . . . I am singularly impressed with the lack of inconsistencies. . . . I'm not going to review [the records] at this time unless Ms. Harris wishes me to review them but that's—that's the ruling of this court."

On appeal, the defendant claims that the trial court's denial of his request to conduct an in camera inspection of Harris' psychiatric records deprived him of his constitutional right of confrontation because Harris' "ability to observe the events of May 30, 2000, and whether or

not she had fabricated the allegations" was central to this case. We are not persuaded and conclude that the trial court properly ruled that the defendant had not made the required preliminary showing to warrant an in camera inspection of mental health records.

"The trial court is vested, in the first instance, with the responsibility of resolving the inherent tension between the broad privilege that our state law affords to a witness concerning the confidentiality of his or her psychiatric communications and records, including those pertaining to the diagnosis, prognosis or treatment for alcohol abuse or alcoholism; see General Statutes (Rev. to 1991) §§ 17-155bb (b) (recodified at General Statutes § 17a-630 [c]), 52-146d, 52-146e; and a criminal defendant's constitutional right to reveal to the [fact finder] facts about a witness' mental condition that may reasonably affect that witness' credibility. . . . The defendant's right of cross-examination does not allow him to discredit and impeach in whatever way, and to whatever extent, the defense might wish. . . . Before a defendant may have access to privileged records that he believes contain information that would allow him to impeach a witness' ability to comprehend, know or correctly relate the truth, [he] must make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Joyner*, 225 Conn. 450, 478, 625 A.2d 791 (1993). "If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. A witness' refusal to consent to such an in camera inspection entitles the defendant to have the witness' testimony stricken." (Internal quotation marks omitted.) *State* v. *Howard*, 221 Conn. 447, 457, 604 A.2d 1294 (1992). We review the trial court's determination

that the defendant failed to meet his preliminary showing and its subsequent refusal to conduct an in camera inspection under an abuse of discretion standard. *State v. Richardson*, 204 Conn. 654, 663, 529 A.2d 1236 (1987).

We note at the outset that a history of mental illness does not automatically impugn a witness' ability to testify truthfully and to relay events accurately. Moreover, the existence of a psychiatric disorder does not "automatically [make] a witness fair game for disclosure of psychiatric records to a criminal defendant." *State* v. *Joyner*, supra, 225 Conn. 479.

During cross-examination, Harris testified at length about her mental illness, the treatment sought and the effect that the medication had on her behavior. The trial court granted the defendant complete latitude to question Harris about these topics, particularly regarding her veracity and anger management issues when not taking the medications.

Significantly, and central to the trial court's determination here, Harris' allegations against the defendant were all corroborated by the observations made by the police officers involved in the case. The police officers noticed that Harris had red marks on her neck, that her shirt was torn and that her vehicle was damaged. Moreover, the defendant's own admission to police officers that he engaged in a physical altercation with Harris also substantiated Harris' version of events.

In addition, the trial court noted, and we agree, that the document from Catholic Family Services that the defendant presented as exhibit D indicated that Harris "has issues with depression, mood swings, anxiety and anger," but that "does not translate into someone who cannot accurately depict the events of this occasion." While the defendant thoroughly questioned Harris, he neither subpoenaed Harris' counselor at Catholic Family Services, whose identity was known to him, nor

offered any other medical or other testimony to establish a connection between Harris' depression and her reliability as a witness. See id.

We, therefore, conclude that the court properly refused to conduct the requested in camera inspection of Harris' mental health records. On the basis of the record before us, we conclude that the defendant has failed to make a preliminary showing that there is a reasonable ground to believe that the failure to produce those records likely impaired his right to impeach the witness.[2]

II

The defendant next claims that court improperly found that his failure to report to his probation officer constituted a violation of a condition of his probation because he lacked sufficient notice that his failure to report formed a basis of his probation revocation hearing. Specifically, the defendant claims that the violation of probation arrest warrant did not provide adequate notice that his failure to report to his probation officer formed one of the grounds for his probation revocation hearing.[3] We are not persuaded.

The following additional facts are pertinent to this issue. In the defendant's violation of probation arrest warrant, it was alleged that, after receiving notice to appear on both May 2 and May 30, 2000, the defendant

---

[2] In so concluding, we mention the state's concern that, given Harris' relationship with the defendant and the fact that the defendant is the father of Harris' children, Harris would have used the issue of the in camera inspection as a means to "circumvent testifying in this case." Had the trial court permitted an in camera review of Harris' records, Harris stated that she would have refused to consent to the inspection, thereby resulting in the striking of the testimony of this principal witness.

[3] The defendant phrases this argument as being that the trial court "improperly found that he violated the terms of his probation because the basis for finding him in violation was beyond the four corners of the arrest warrant."

failed to report to his probation officer.[4] Moreover, the warrant provided that as a result of the altercation with Harris on May 30, 2000, the defendant was arrested for assault in the third degree and reckless endangerment in the first degree. Accordingly, the warrant stated that the defendant "is considered to be in violation of his probation based on his noncompliance with the following: 'Do not violate any law.' "

At the commencement of the hearing, the defendant argued that he lacked notice that his failure to appear on May 2 and May 30, 2000, formed one of the grounds for the potential revocation of his probation. Specifically, the defendant contended that because the warrant provided that he is considered to be in violation of his probation due to his noncompliance with the proscription against violating any law, he was unaware that his failure to appear formed the basis of the proceedings as well. The trial court replied that the warrant provided sufficient notice to the defendant in that it explicitly enumerated his failure to report to his probation officer on two occasions.

In announcing its finding that the defendant violated conditions of his probation, the court stated: "[The defendant] was not to violate any law; he was to report to his probation officer. And I consider those two issues to be the subject of this violation. Now, I know the defense claims otherwise, or at least has during the course of the hearing, that because of the wording 'Do not violate any law,' I should only consider whether or not there was some kind of altercation between Ms. Harris and the defendant. I indicated before, and I'll

---

[4] The warrant additionally detailed several prior occasions when the defendant failed to report to his probation officer and neglected to inform the probation officer of his address. In fact, on September 14, 1998, the defendant was arrested for violation of probation based on his failure to report and, on November 8, 1999, was found in violation of his probation. The trial court, however, did not revoke the defendant's probation at that time.

indicate again, I think the defendant is on fair notice in that it is also alleged in the warrant that he failed on two occasions to report to his probation officer. So I think that merely because of the words 'do not violate any law,' I think the—the substance of the arrest warrant application rules here and there is clearly more than one violation; there's actually, technically, I suppose, three violations. I find that the—to a fair preponderance of the evidence that the defendant has violated the terms of his probation" on all three grounds.

We note at the outset that the defendant does not challenge the court's conclusion that his actions toward Harris constituted a violation of the condition of his probation that he not violate any law. Therefore, because the defendant does not contest the court's finding that he violated his probation by committing a crime, it is unnecessary to address the defendant's argument that he was not afforded adequate notice that he faced probation revocation on the alternative ground of his failure to report. See *State* v. *Samuel*, 57 Conn. App. 64, 71, 747 A.2d 21, cert. denied, 253 Conn. 909, 753 A.2d 942 (2000). We will, nonetheless, take this opportunity to resolve this issue.

"In *Morrissey* v. *Brewer*, 408 U.S. 471, 489, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972), the United States Supreme Court held that the minimum requirements of due process include '(a) written notice of the claimed violations of [probation] . . . .'" *State* v. *Strickland*, 42 Conn. App. 768, 781, 682 A.2d 521 (1996), rev'd on other grounds, 243 Conn. 339, 703 A.2d 109 (1997). General Statutes § 53a-32 (a) further provides in relevant part: "At such [probation violation] hearing the defendant shall be informed of the manner in which such defendant is alleged to have violated the conditions of such defendant's probation or conditional discharge . . . ."

The defendant claims that the statement contained in the warrant that "the offender is considered to be

in violation of his probation based on his noncompliance with the following: 'Do not violate any law,' " did not sufficiently notify him that his failure to report also formed a basis for the revocation of his probation. We disagree.

A thorough review of the record reveals that the defendant possessed sufficient notice that his probation revocation hearing was based on both his noncompliance with the provision that he "not violate any law" and his failure to report to his probation officer on May 2 and May 30, 2000. The violation of probation arrest warrant set forth at the outset the various conditions of his probation to which the defendant agreed to adhere to, including that he should not violate any law and that he must report as his probation officer directs. Moreover, in addition to detailing the incident involving Harris, the arrest warrant explicitly described the occasions when the defendant was directed to report to his probation officer and subsequently failed to appear. The defendant did not request a bill of particulars to clarify the basis of the probation revocation proceeding. Moreover, at the commencement of the hearing, the state read into the record the arrest warrant and stated that it was proceeding on the grounds that the defendant failed to report to his probation officer and violated the law based on the incident with Harris. In fact, during the hearing the defendant's probation officer testified regarding the defendant's failure to report on May 2 and May 30, 2000.

Under those circumstances, we conclude that the defendant received adequate notice regarding all of the grounds on which he was ultimately found to have violated his probation. See State v. Pierce, 64 Conn. App. 208, 214–15, 779 A.2d 233 (2001); State v. Repetti, 60 Conn. App. 614, 617–18, 760 A.2d 964, cert. denied, 255 Conn. 923, 763 A.2d 1043 (2000). When we read the warrant in its entirety, and not in isolated parts, it is

clear that the defendant was on notice that his failure to report to his probation officer was part of the basis for the probation revocation proceeding. Further, the hearing was based solely on the allegations contained in the warrant.

The judgment is affirmed.

In this opinion the other judges concurred.